IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

UNITED STATES OF AMERICA           )
                                   )
         v.                        )           CR 120-026
                                   )
KELVIN LARON HOWARD                )
_____

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
_____

Defendant, facing heroin distribution and firearm charges, is proceeding *pro se* and filed pretrial motions seeking dismissal of the indictment and suppression of evidence.  After carefully considering the briefs, as well as all evidence and oral argument presented at a hearing on August 9, 2021, the Court **REPORTS AND RECOMMENDS** Defendant's Motions for Dismissal of the Indictment for Selective Prosecution be **DENIED**, (doc. no. 92, pp. 11, 14-16; doc. no. 93), Defendant's Motion to Suppress the Statements of Officer Cecil Ridley be **DENIED**, (doc. no. 121, 127), Defendant's Motion for Dismissal of the Indictment for Speedy Trial Act Violation be **DENIED**, (doc. no. 92, p. 11), and Defendant's Motions for Dismissal of the Indictment/Suppression of the Evidence be **DENIED**, (doc. nos. 92, pp. 7-9; doc. nos. 94, 120, 122, 124, 128, 130, 134).

I.       **PROCEDURAL BACKGROUND**

On May 20, 2020,  the grand jury in the Southern District of Georgia charged Defendant in a three-count indictment with (1) possession with intent to distribute controlled substances (heroin), in violation of 21 U.S.C. § 841(a)(1);  (2) possession of a firearm in furtherance of a

drug trafficking crime, in violation of 18 U.S.C. § 924(c); and (3) possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (Doc. no. 1.) On September 10, 2020, the Court held an initial appearance for Defendant where he stated he wished to retain his own counsel. (Doc. no. 18.) The Court reconvened with Defendant on September 16, 2020, and Defendant requested the Court appoint him counsel. (Doc. no. 21.)

After Defendant ran through no less than three court-appointed attorneys because of disagreements over the filing of pretrial motions, Defendant opted to proceed *pro se* during a hearing on February 11, 2021. (Doc. no. 77.) Because *pro se* defendants often prolong and complicate trials unnecessarily due to their unfamiliarity with basic courtroom procedures, the Court ordered Mr. Andrew Murdison, the third and final court-appointed attorney, to remain in the case as standby counsel and be present for all hearings and trial. (See id.)

By Order dated February 26, 2021, the Court reopened the pretrial motions period and set Defendant's new motions deadline as April 2, 2021. (Doc. no. 82.) The Court allowed Defendant this additional opportunity to file pretrial motions in light of his transition to *pro se* status and despite the fact Defendant had three prior opportunities to file pretrial motions coinciding with appointment of his three-prior court-appointed attorneys. By Orders dated April 28, May 21, and June 11, 2021, the Court extended the deadline for Defendant to file pretrial motions until June 30, 2021 to ensure Defendant acting *pro se* had ample time and resources available to conduct legal research and prepare any final pretrial motions. (Doc. no. 110; doc. no. 117; doc. no. 118.)

2

On August 9, 2021, the Court heard oral argument on all pretrial motions and conducted an evidentiary hearing concerning Defendant's motion to suppress.  (Doc. no. 147.)  The Court provided Defendant the opportunity to review all motions filed on the docket, and Defendant represented that all motions he had prepared were filed.  Hearing Transcript ("Hrg. Tr."), doc. no. 163, pp. 3-5.  During the hearing, the government submitted into evidence video recordings of a search warrant execution occurring on August 23, 2021.  Hrg. Tr., p. 36; (doc. no. 148.) The government called a single witness, Investigator Charles Kaminer, to testify at the hearing. Hrg. Tr., p. 20.  Defendant also testified.  Hrg. Tr., p. 97.

On August 27, 2021, Defendant moved for recusal of the undersigned for proceeding with the evidentiary hearing in the absence of standby counsel.  (Doc. no. 150.)  The Court denied Defendant's motion for recusal as meritless.  (Doc. no. 154.)  However, in an abundance of caution, the Court granted Defendant permission to review the transcript with standby counsel and request permission to reconvene upon a showing of prejudice.  (Id.)  The Court held a status conference for Defendant to enumerate any showing of prejudice, at which Defendant requested an opportunity to file supplemental briefing.  (Doc. no. 168.)  The Court found no prejudice and denied Defendant's request to reopen the evidentiary hearing but did grant Defendant permission to file a supplemental brief concerning the suppression issues and replaced Defendant's standby counsel.  (Id.)  On September 9 and 24, 2021, Defendant moved for sanctions against Investigator Kaminer, the sole government witness at the hearing.

## II.     FACTUAL BACKGROUND

### A.     Prelude

On October 25, 2018, Defendant applied for a temporary protective order against Amber Nicole Sizemore in the Superior Court of Richmond County, Georgia. (Doc. no. 92-7, pp. 3-9.)   The petition alleged Defendant and Ms. Sizemore formerly resided together in Defendant's apartment at 602 Fairhope St., Apt. 1321, Augusta, Georgia.   (Id. at 3-4.) Defendant asserted Ms. Sizemore had, in the past week, "shoved [him] against the wall brandishing a 9-millimeter fully loaded weapon."   (Id. at 3.)   Defendant also stated Ms. Sizemore "demanded [he] give her money" and threatened to "fabricate a story that I had threaten [sic] her pointing a weapon at her, and that drugs were in [Defendant's] apartment." (Id. at 4.)   On November 14, 2018, Superior Court Judge Daniel J. Craig, held a hearing and issued a protective order in Defendant's favor.  (Id. at 11-14.)   It appears from the order that Ms. Sizemore failed to appear for the hearing.  (Id. at 16-21.)   The protective order instructed Ms. Sizemore to stay away from Defendant's apartment and at least 500 yards away from Defendant until at least November 14, 2019.  (Id.)   After Ms. Sizemore found out about the protective order, she made numerous threats to kill Defendant, frame him for drug distribution, and kill his grandchildren.  Hrg. Tr. 114-16.   When investigating officers executed a search warrant for Defendant's apartment on August 23, 2019, however, Ms. Sizemore was living in Defendant's apartment again.  (Body Worn Camera Transcript 1 ("BWC1 Tr."), doc. no. 148-2, p. 7.)

**B.      Investigator Kaminer's Testimony Regarding Investigation**

**1.      Controlled Buys**

On or about August 5, 2019, Investigator Charles Kaminer, a member of Richmond County Sheriff's Office narcotics division, received information from a fellow investigator about a confidential informant who claimed Defendant was a heroin dealer and he or she could buy heroin from Defendant.  Hrg. Tr., pp. 20-22.  On August 8, 2019, Investigators Kaminer and Kyle Gould worked with the informant to execute a controlled buy from Defendant.  The effort began by meeting with the informant, conducting a search of the informant's person and vehicle to ensure the informant had no money or narcotics prior to the controlled buy, and furnishing the informant with cash that Investigator Kaminer obtained from the Sheriff's Office.  Id. at 22-23.  The investigators followed the informant to Defendant's apartment complex at 602 Fairhope Street in Augusta, Georgia.  Id. at 23.  The informant told the investigators Defendant resided in apartment 322 on the third floor, and the investigators observed the informant enter the first floor of Defendant's apartment building.  Id. at 23-24; (doc. no. 149-1, p. 2.)

Approximately fifteen minutes later, Investigator Kaminer witnessed the informant exit the building.  Hrg. Tr., p. 25.  The investigators followed the informant back to a predetermined location, where they again searched the informant's car and person.  Id.  The informant recounted the controlled buy to the investigators and gave them heroin allegedly bought from Defendant while inside his apartment.  Id.  The informant explained Defendant's apartment

number was 1321 and not 322.  Id. at 62-63.  Investigator Kaminer's independent investigation corroborated 1321 as Defendant's correct apartment number.  Id. at 64.

Investigator Kaminer field-tested the substance, which tested positive for heroin, but did not take any pictures or video recording of the heroin or positive field test.  Id. at 26, 58-59.  Investigator Kaminer took the narcotics back to the Richmond County Sheriff's Office evidence locker before sending it to the Georgia Bureau of Investigation ("GBI") lab for further testing on September 10, 2019.  Hrg. Tr., pp 55-56; (Doc. no. 149-1, p. 2.)  Investigator Kaminer completed a purchase of evidence sheet signed by himself and a witnessing officer on August 8, 2019, stating the informant spent $160 to buy the heroin.  Id. at 67; (doc. no. 149-3, p. 3.)  While Investigators Kaminer and Gould signed the cash release form on August 8, 2019, Lieutenant Joel Danko did not sign the form as the approving officer until the day after the controlled buy on August 9, 2019.  (Doc. no. 149-3, p. 3.)  Investigator Kaminer testified the purpose of this form was to memorialize the occurrence of a controlled buy and not to seek advance permission to obtain cash before a controlled buy. (Id.); Hrg. Tr., p. 67.

The same team executed a second controlled buy from Defendant on August 21, 2019.  Investigators Kaminer and Gould followed the same procedures as the first controlled buy except this time they correctly noted Defendant's apartment number as 1321.  Hrg. Tr., pp. 27-28; (doc. no. 149-1, p. 3.)  After the controlled buy the informant again turned over heroin, which field-tested positive.  Hrg. Tr., pp. 27-28.  Investigator Kaminer did not take any pictures or video recording of the heroin or positive field test.  Id. at 26, 58-59.  Again, Investigator Kaminer took the narcotics back to the Richmond County Sheriff's Office evidence locker

before sending it to the GBI lab for further testing on September 10, 2019.  Hrg. Tr., pp 55-56;

(Doc. no. 149-1, p. 3.)  Like before, Investigators Kaminer and Gould signed the cash release

form on the day of the controlled buy but Lieutenant Danko signed it the next day.  (Doc. no.

149-1, p. 3.)

### 2.    State Court Search Warrant

On August 22, 2019, Investigator Kaminer submitted a search warrant application and

supporting affidavit to Richmond County Superior Court Judge John Flythe.  Hrg. Tr., pp. 28-

29; (doc. no. 148-5.)  The application listed the target as Kelvin Laron Howard and the location

as 602 Fairhope St., Apt. 1321, Augusta-Richmond County, Georgia.  (Doc. no. 148-5, p. 1.)

Investigator Kaminer's affidavit detailed the second controlled buy on August 21, 2019,

"within the last 72 hours," in support of probable cause for the search warrant.  (Id. at 5.); Hr.

Tr. p. 29.  The affidavit described Investigator Kaminer's interactions with  the confidential

informant in a manner that is consistent with his above-described testimony at the suppression

hearing.  (Doc. no. 148-5, p. 5.)  The affidavit further recounted the informant's information

that Defendant possessed a firearm inside the apartment.  (Id.)  At 3:51 P.M. on August 22,

2019, Judge Flythe authorized the search warrant with a no-knock provision.  (Id. at 8-11.)

### 3.    Execution of Search Warrant

On August 23, 2019, at 8:30 A.M., Investigator Kaminer proceeded to Defendant's

apartment accompanied by Investigators Calvin Swann, Kyle Gould, Cecil Ridley, Zach

Chalker, Jose Ortiz, Megan Weddle, Sergeant Julio Concepcion, and Lieutenant Joel Danko.

Hrg. Tr., p. 30.  Execution of the search warrant was recorded on five body cameras.  (See doc.

no. 148-1, Body Warn Camera Disc 1, ("BWC1"); doc. no. 148-3, Body Warn Camera Disc 2, ("BWC2").)[1]   The officers approached the apartment complex in multiple vehicles, entered a code to open the gate, entered Defendant's building, and proceeded to the third floor.  BWC1 at 00:00-00:30.

As the officers turned the corner to Defendant's apartment, a woman with blonde hair exited Defendant's apartment.  Id. at 01:40-01:45.  Investigator Gould ran through the open apartment door.  Id. at 01:45-01:48; BWC1 Tr., p. 3.  The officers tackled Defendant to the ground, knocking money out of Defendant's grasp, and  "a bag of dope" was sticking out of Defendant's pocket.  BWC1 at 01:49-02:31; BWC Tr., p. 1.  After Defendant is assisted from the ground and placed in a chair in the foyer, Investigator Ridley can be seen walking away from the foyer into the living room, and he can been seen at the edge of the living room intermittently over the next few minutes.  BWC1 at 04:03, 4:25-07:08.

As the officers continued into the apartment, they approached Ms. Sizemore and her dog.  Lieutenant Danko instructed the officers to handcuff Ms. Sizemore "in the front so she can get the dog."   BWC1 at 02:31-05:05; BWC1 Tr., p. 4.  Ms. Sizemore escorted the dog into the bathroom, and the officers placed Ms. Sizemore on the couch.  BWC1 at 05:06-06:30.  The officers escorted Defendant to the couch next to Ms. Sizemore, and Investigator Gould read them their Miranda rights.  Id. at 06:31-10:29; BWC1 Tr., p. 7.  While a few officers asked some background questions of Defendant and Ms. Sizemore, the remaining officers searched the apartment.  BWC1 at 10:30-21:40.  At one point, Lieutenant Danko requested

---

[1]The government submitted two compact discs into evidence, the two compact discs contain footage from five separate body worn cameras.

Investigator Cecil come over with the camera and commented, "[o]ooh that's right off a brick."
Id. at 21:41-23:36; BWC1 Tr., p. 13.

Investigators Kaminer, Ridley, and Gould, along with Lieutenant Danko, escorted Defendant into his bedroom and sat on his bed beside Defendant.  BWC2 at 05:26.  Investigator Ridley told Defendant,

> [y]ou got some issues. I mean, uh, I think you know that right.  That weight there, that is quite a bit.  I mean if there's somethin' that's gon' [sic] be said, it probably need [sic] to be said now.  You know, we, and the thing about that is, you know what I'm sayin', let's get it understood, we make no promises, okay.

Id. at 06:06-6:33; BWC2 Tr., p. 5.  Defendant responded, "I know how it works."  BWC2 at 06:37; BWC2 Tr., p. 5.  Over the next twenty-two minutes, Defendant gave a detailed confession concerning his distribution business including where he purchased controlled substances, to whom he sold controlled substances, and the amount of controlled substances currently in his apartment.  BWC2 at 06:50-29:13; BWC2 Tr., pp. 6-35.

### C.    Defendant's Testimony

Defendant testified briefly at the hearing despite the Court reminding him of his right to remain silent.  Defendant testified on direct examination in its totality as follows:

> On this – on the day in question about the statement that was made was made under duress, coercion, and death threats to my family and myself if I didn't comply with this one particular person's wishes and that's the consensus that I had to adhere to at the particular time I was being questioned.

Id. at 97-98.  On cross examination,  Defendant testified Ms. Sizemore previously threatened to tell the police he was selling drugs, and on the day of the search Investigator Ridley threatened him.  Id. at 98-103.  Defendant also stated the presence of officers in his house

9

constituted a threat and caused him duress.  Id. at 101-03.  Defendant clarified on re-direct examination that Officer Ridley "told [me] if I didn't comply, I would be dead . . . it was during the time that I was, you know being in the hallway in the foyer of the apartment."  Id. at 109.

## III.    DISCUSSION

### A.    Motions to Dismiss Indictment for Selective Prosecution

Defendant moves to dismiss the indictment, arguing the government is selectively prosecuting him, while not pursuing any charges against Ms. Sizemore and the unidentified female who was leaving Defendant's apartment as police were arriving to execute the search warrant.  Both females are Caucasian, and Defendant is African American.  Defendant accuses Ms. Sizemore of framing him with the heroin and handgun, consistent with the accusation he made against her in his October 2018 petition for a protective order.  Therein, he accused Ms. Sizemore of threatening to "call the police and tell them that I had threatened her with a weapon and I had drugs in my apartment."  (Doc. no. 92-7, p. 3.)

In order to prove a claim of selective prosecution, Defendant bears a heavy burden of showing:  (1) he has been singled out for prosecution although others similarly situated who have committed the same acts have not been prosecuted, and (2) the government's selective prosecution of him has been constitutionally invidious.  United States v. Jones, 52 F.3d 924, 927 (11th Cir. 1995) (internal citation and quotation marks omitted).  Defendant's contentions concerning Ms. Sizemore, while interesting and perhaps relevant to his guilt or innocence, do not state a valid claim for selective prosecution.

Defendant's allegations do not show Ms. Sizemore is similarly situated or committed the same acts. Indeed, the informant pinpointed Defendant, not Ms. Sizemore, as a drug dealer; it was Defendant who allegedly sold the heroin to the informant in two controlled buys; police found the drugs and firearm in Defendant's apartment; and Defendant gave a full confession to the investigating officers. The same is true to an even greater degree concerning the unidentified female who was leaving Defendant's apartment when the police arrived to execute the search warrant. There is no allegation or evidence she is similarly situated in any way with Defendant. Therefore, Defendant's motions to dismiss for selective prosecution should be **DENIED**. (Doc. no. 92, pp. 11, 14-16; doc. no. 93)

### B.    Motion to Suppress Investigator Ridley's Statements

Citing the Confrontation Clause, Defendant seeks suppression of statements made by Investigator Cecil Ridley, who was shot and killed in the line of duty in November 2019. (Doc. nos. 121, 127.) The government contends Investigator Ridley's statements are admissible under Fed. R. Evid. 801(d)(2). (Doc. no. 135, pp. 3-4.) Pretrial suppression of evidence is governed by constitutional standards, and the question presented by Defendant's motion is an evidentiary one best left to determination by the presiding District Judge in the context of a timely motion in limine or objection at trial. Accordingly, the motions to suppress Investigator Ridley's statements should be **DENIED**. (Doc. nos. 121, 127.)

### C.    Motion for Dismissal of Indictment

Defendant argues for dismissal of the indictment because he was allegedly not indicted within sixty days of his arrest, citing 18 U.S.C. § 3161(b), which provides in pertinent part as

11

follows: "Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." Defendant argues the relevant time period is August 23, 2019, the date of his arrest on state charges, and May 20, 2020, the date of his federal indictment. (Doc. no. 92, p. 11.) However, "[i]t is long and well-settled in this Circuit that, notwithstanding any coordination between state and federal officials, the time within which federal authorities must indict a defendant under the Speedy Trial Act is measured by the date of the federal arrest, not any state arrest." United States v. Alvarado-Linares, 698 F. App'x 969, 974 (11th Cir. 2017). Because Defendant's federal indictment preceded his transfer to federal custody, there was no pre-indictment delay under 18 U.S.C. § 3161, and his motion to dismiss should be **DENIED**. (Doc. no. 92, p. 11.)

**D.     Motions for Dismissal of Indictment and/or Suppression of Evidence**

Defendant argues for suppression of all evidence obtained during the search of his apartment, and suppression of the statements he made that day to law enforcement officers, arguing (1) the search warrant itself is tainted with material misrepresentations by Investigator Kaminer in his supporting affidavit; and (2) officers coerced him into making incriminating statements by threats and intimidation. Neither contention is credible, and there is no basis for suppression.

**1.     The Search Warrant Is Valid and Not Based on Falsehoods**

Defendant contends the search warrant is invalid because Investigator Kaminer fabricated the two controlled buys in order to obtain the search warrant based on entirely false

pretenses, and Officer Daryl T. Oehrlein perjured himself before federal the grand jury by adopting Investigator Kaminer's statements as true.  (Doc. no. 92, pp. 7-9; doc. nos. 94, 120, 130, 134.)  Defendant's arguments are unpersuasive, and the search warrant is unquestionably valid.  Before explaining why, the Court will first consider the basic requirements of a search warrant.

"'Probable cause to support a search warrant exists when the totality of the circumstances allows a conclusion that there is a fair probability of finding contraband or evidence at a particular location.'"  United States v. Carroll, 866 F.3d 1347, 1351 (11th Cir. 2018) (quoting United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999).  The affidavit supporting an application "should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity."  United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002).  Appellate courts show great deference to a judicial officer's finding of probable cause.  United States v. Bradley, 644 F.3d 1213, 1263 (11th Cir. 2011).

Here, the supporting affidavit established probable cause for the warrant by describing two controlled buys of heroin by the same informant from Defendant at his residence.  (Doc. no. 148-5, Gov't Ex. 3.)  Controlled buys provide a firm foundation for a finding of probable cause.  See, e.g., United States v. Prather, 279 F. App'x 761, 765-66 (11th Cir. 2008) (finding probable cause for search warrants where affidavits contained facts regarding recent controlled buys of drugs and arrests of persons exiting residence to be searched who possessed drugs); United States v. Wells, CR 305-006, 2005 WL 2237630, at *2 (S.D. Ga. Aug. 19, 2005)

("There is no stronger evidence that the defendant was storing and selling cocaine from his residence and the residence across the street than a controlled purchase of cocaine from the defendant at the location of the search warrants."), *adopted by* CR 305-006, doc. no. 19 (S.D. Ga. Sept. 12, 2005).

Defendant alleges Investigator Kaminer committed perjury by fabricating both controlled buys.  (Doc. no. 92, p. 9.)  After carefully considering Defendant's contention and reviewing the record evidence, the Court finds Investigator Kaminer's hearing testimony to be credible and rejects Defendant's perjury accusations.

"Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Williams, 731 F.3d 1222, 1230 (11th Cir. 2013) (citing United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002)); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing credibility determinations are within province of factfinder); Carr v. Schofield, 364 F.3d 1246, 1264-65 (11th Cir. 2004) (recognizing court's opportunity to observe and study witnesses to make credibility determination  concerning testimony).  In making its credibility determination, the Court must take into consideration not only the interests of the witness, but also "the internal consistency of the [witness's] testimony, or his candor or demeanor on the stand." Ramirez-Chilel, 289 F.3d at 749, 750 (citation omitted).

The Court credits the testimony of Investigator Kaminer, who was a seasoned officer in the narcotics division with extensive narcotics training and decades of experience.  At the

hearing, Investigator Kaminer's testimony was internally consistent and logically sound, and remained so during cross-examination. Investigator Kaminer recounted his interactions with the confidential informant and the controlled buys in a sincere, consistent, detailed, and methodical manner, referring to his records when necessary.

Defendant's self-serving testimony that the controlled buys never occurred is not credible. Indeed, if all of Defendant's accusations were believed, Ms. Sizemore falsely accused him of being a heroin dealer, Investigator Kaminer completely fabricated the two controlled buys and perjured himself, and Officer Ridley threatened to kill Defendant during the opening minutes of the apartment search. The sole, affirmative evidence of these transgressions is Defendant's mere self-serving accusations, which fly in the face of the record evidence, including not only Investigator Kaminer's credible hearing testimony but also the body camera footage, seizure of heroin from Defendant's apartment, investigative reports and documents signed by Investigators Kaminer and Gould, and Lieutenant Danko, and Defendant's own recorded and detailed admission of being a heroin dealer.

In support of his perjury allegation, Defendant argues Investigator Kaminer (1) did not obtain the cash used in the controlled buys until August 9 and 22, 2019, the day after each controlled buy occurred on August 8 and 21, 2019; (2) failed to produce copies of the cash used in the buys; and (3) did not make an audio or video recording of the controlled buys or field tests. None of these arguments are persuasive.

Defendant's first criticism derives from his reading of the form Investigator Kaminer completed when he obtained cash from the Sheriff's Office to be used in the two controlled

buys, but these forms support, rather than undermine, Investigator Kaminer's testimony.  (Doc. no. 149-1, p. 3; doc. no. 149-3, p. 3.)  Investigator Kaminer signed the forms to certify his receipt of the cash on the same dates as the controlled buys.  Investigator Gould signed both forms on these dates as well.  While the approving supervisor signed both forms on the day after the controlled buys, this alone is woefully inadequate to support a finding Investigator Kaminer completely fabricated both controlled buys as a means to fraudulently apply for and receive a search warrant.  Furthermore, Investigator Kaminer repeatedly explained during the suppression hearing that the policy of the Sheriff's Office was to complete this form to memorialize the occurrence of a controlled buy and not to seek advance permission to obtain cash before a controlled buy.  Hrg. Tr., p. 67; (doc. no. 149-3.)  More importantly, the fact that both controlled buys did occur finds ample support in these two documents signed by three law enforcement officers within twenty-four hours of both controlled buys.

Defendant's remaining arguments are also unpersuasive.  That Investigator Kaminer did  not produce, and apparently cannot find, a copy of the cash used in the controlled buys, and made no attempt to record the controlled buys, suggests nothing untoward or perjurious.  As Investigator Kaminer explained, a copy of money used in a controlled buy "mostly would be used in sales cases or if we were trying to match it up," but cash used in controlled buys is irrelevant where, as here, the defendant is charged with possession of drugs on a date subsequent to the controlled buys, and the cash used in controlled buys is never located in the defendant's possessions.  Hrg. Tr., p. 68.  Lastly, Defendant also points to a scrivener's error in the original grand jury transcript listing "Eric Cantor" as opposed to "Kaminer."  Such an

immaterial error does not show any intentional deceit on the part of Officer Oehrlein, who did nothing wrong by affirming to the grand jury the credible information determined by Investigator Kaminer during his investigation.  Therefore, the Court recommends Defendant's motions for dismissal of the indictment be **DENIED**.  (Doc. no. 92, pp. 7-9; doc. nos. 94, 120, 130, 134.)

### 2.   Defendant's Statements Were Voluntarily, Knowingly, and Intelligently Made

Defendant argues for suppression of all statements he made to officers during execution of the warrant, contending he was in custody but never Mirandized, requested but was denied legal representation, and made the statements involuntarily.  (Doc. nos. 122, 124, 128); see generally 18 U.S.C. § 3501; Jackson v. Denno, 378 U.S. 368 (1964).  Certainly, suppression would be required if any of these three contentions were true.  But as explained in detail below, the Court finds the body camera footage and sworn testimony of Investigator Kaminer to be far more credible on these points than the generalized and self-serving assertions made by Defendant in his affidavit and testimony.

### a.   Officers Properly Mirandized Defendant

The Fifth Amendment to the U.S. Constitution provides, "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend V.  This basic Constitutional right requires that, prior to conducting a custodial interrogation, law enforcement officers must Mirandize the suspect.  Miranda v. Arizona, 384 U.S. 436, 444 (1966); Florida v. Powell, 559 U.S. 50, 59 (2010).  The Supreme Court has defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been

17

taken into custody or otherwise deprived of his freedom of action in any significant way."
<u>Miranda</u>, 384 U.S. at 444.  Defendant's argument fails because the body camera footage shows officers Mirandizing Defendant prior to him making any statements.  BWC1; BWC2.

### b.   Defendant Did Not Request Legal Counsel

The Court rejects Defendant's self-serving claims that officers ignored his request for counsel, threatened to injure him if he did not cooperate, and continued the interrogation despite Defendant requesting legal counsel.  The law is well-settled that questioning must stop if a suspect unequivocally and unambiguously invokes his rights under <u>Miranda</u> and requests an attorney.  <u>Owen v. Fla. Dep't of Corr.</u>, 686 F.3d 1181, 1194 (11th Cir. 2012).  Here, however the Court credits the testimony of Investigator Kaminer that Defendant never asked for an attorney and the officers on the scene never discouraged him from retaining an attorney.  The video footage corroborates Investigator Kaminer's testimony, showing no threats made to Defendant nor any requests by Defendant for an attorney on any of the footage from five body cameras.  <u>See</u> BWC1; BWC2.

Defendant alleges that, upon initial entry into his apartment, Officer Ridley, an African American male, told Defendant  "if [he] didn't comply [he] would be a dead nigger."  Hrg. Tr., p. 109.  Officer Ridley died in the line of duty in November 2019, long before Defendant leveled this accusation against him.  The accusation is completely at odds with the conduct of Officer Ridley and his entire team during the search of Defendant's apartment, as depicted in the extensive body camera footage.  Investigator Kaminer denied knowledge of any such threat by anyone that day.  Hrg. Tr., p. 37.  Further, the camera footage corroborates Investigator

18

Kaminer's testimony that Defendant understood his rights, showed no signs of duress, and did not voice any accusation of any threats being made at any time throughout the warrant execution.  See BWC1; BWC2.  Indeed, the government submitted footage from five body cameras, and none of them lend any support to Defendant's accusations.  Defendant alleges Officer Ridley communicated the threat during the opening minutes of the search when Defendant was in his hallway, just before officers moved Defendant to his couch.  Hrg. Tr., p. 109.  However, the camera footage shows Defendant being assisted from the ground and placed in a chair in the foyer while Officer Ridley is walking away from the foyer into the living room, and he can been seen at the edge of the living room intermittently over the next few minutes.  BWC1 at 04:03, 4:25-07:08.  While the Court cannot say with certainty that Officer Ridley had no time off-camera to make such a threat, the footage suggests improbably small gaps of time for such a threat to be made off-camera.

For all of these reasons, the Court finds Defendant did not request legal counsel and no threat was made to harm him if he did not cooperate.

### c.    Defendant's Statements Were Voluntary

The Fifth Amendment privilege against self-incrimination applies during a custodial interrogation, but a suspect may waive his right to remain silent provided he does so "voluntarily, knowingly and intelligently."  Miranda, 384 U.S. at 444, 460–61. The government has the burden of showing the knowing and intelligent nature of a waiver. Id. at 475.  The analysis asks two questions.  First, was the waiver made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon

it?  United States v. Ransfer, 749 F.3d 914, 935 (11th Cir. 2014).  Second, was the waiver voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception?  Id.  Only if the totality of the circumstances proves both the requisite level of comprehension and an uncoerced choice may a court properly conclude that Miranda rights have been waived.  Id.

As to the first question, the totality of the circumstances proves Defendant fully understood his right to remain silent and the consequences of his waiver.  Officers Mirandized Defendant once during the search of his residence and again before questioning Defendant.  See BWC1; BWC2.  Further, the Court has had numerous interactions with Defendant and has no doubt of his capacity to understand his rights.  Defendant directly acknowledged his understanding before answering the officers' questions in his apartment by stating, "I know how it works."  BWC2 at 06:37; BWC2 Tr., p. 5.

Turning to the voluntariness inquiry, the Court must ultimately determine "whether a statement was made freely or whether the defendant's 'will has been overborne and his capacity for self-determination has been critically impaired.'"  Devier v. Zant, 3 F.3d 1445, 1455–56 (11th Cir. 1993) (quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)).  In Jackson v. Denno, 378 U.S. 368 (1964), the Supreme Court explained that a defendant is deprived of Due Process if he is convicted, based in any part, on an involuntary confession.  378 U.S. at 376.  Coercion may be mental or physical, Blackburn v. Alabama, 361 U.S. 199, 206 (1960), and "sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the

20

making of a promise that induces a confession." <u>United States v. Thompson</u>, 422 F.3d 1285, 1295-96 (11th Cir. 2005).

When deciding whether a confession was voluntary, courts consider the totality of the circumstances including (1) details of the interrogation; (2) the defendant's education, intelligence, and other characteristics; (3) length of detention; (4) questioning that is repetitious or prolonged; (5) physical punishment such as the deprivation of food or sleep; and (6) any promises to induce a confession. <u>Ransfer</u>, 749 F.3d at 935; <u>see also</u> <u>Colorado v. Connelly</u>, 479 U.S. 157, 163 n.1 (1986); <u>United States v. Bernal–Benitez</u>, 594 F.3d 1303, 1319 (11th Cir. 2010); <u>Waldrop v. Jones</u>, 77 F.3d 1308, 1316 (11th Cir. 1996).

Here, considering the totality of the circumstances, the Court finds Defendant's statements to the officers at his apartment were voluntary and the product of a free and deliberate choice, made in the absence of intimidation, coercion, and deception. All six factors weigh heavily against Defendant as depicted in the extensive camera footage of the search and questioning, and Investigator Kaminer's credible testimony.

Indeed, the interrogation was as polite and cordial of an interaction as one could imagine under the circumstances. Defendant was cooperative. The tone of Defendant and the officers was calm and friendly. No one used any coarse language or raised their voices, and no threats were made toward Defendant. Defendant did not ask to stop speaking with officers. Nor did he ever ask for a break or to move around the apartment. Defendant is intelligent. The entire time of detention from the outset of the search through conclusion of Defendant's questioning and arrest was a mere sixty-minutes and nine-seconds. BWC 1; BWC2. The

questions posed to Defendant were not repetitious or prolonged, and Defendant was not physically punished or deprived of food, water, or any other necessities.  Nor did the officers make any promises.  Indeed, the body camera footage shows the officers emphasizing to Defendant they could not make him any promises.  BWC2 at 06:37; BWC2 Tr. p. 5.

Moreover, the conversation with the officers occurred within the comfort and recognizable surroundings of Defendant's own home.  Although questioning in a defendant's home is not dispositive, United States v. Brown, 441 F.3d 1330, 1348 (11th Cir. 2006), "courts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." United States v. Gomes, 279 F. App'x 861, 868 (11th Cir. 2008) (citation omitted); see also United States v. Newton, 369 F.3d 659, 675 (2d Cir. 2004) ("[A]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial."); United States v. Peck, 17 F. Supp.3d 1345, CR 113-171, 2014 WL 1572437, at *14 (N.D. Ga. Apr. 18, 2014) (questioning in a suspect's home weighs against determination of custodial interrogation requiring Miranda warnings).

As to Defendant's general allegation of intimidation and fear because multiple officers barnstormed his apartment wearing uniforms and displaying weapons, the mere execution of a warrant by officers is an insufficient basis for suppression absent improper threats, use of force, inducements, deception, or coercion. United States v. Scott, CR 106-012, 2006 WL 1517108 at *6 (S.D. Ga. May 26, 2006) (finding presence of officers on scene alone did not establish intimidating coercion).  The government acknowledges officers tackled Defendant

upon entry into his apartment, however such *de minimis* use of force does not raise constitutional concerns.  See Croom v. Balkwill, 645 F.3d 1240, 1252-53 (11th Cir. 2011) (finding pushing occupant to ground and restraining movement during warrant execution *de minimis*).  Moreover, as explained in § II(D)(2)(b) *supra*, no officer threatened Defendant in any way, and Officer Ridley did not threaten to kill Defendant.  Because there is no credible evidence of any such improprieties, the Court finds Defendant's statements to the police at the time of the apartment search were entirely voluntary.

For all of the above reasons, the Court finds, by a preponderance of the evidence and in consideration of the totality of the circumstances, that (1) Defendant waived his right to remain silent with a full awareness of both the nature of the right and the consequences of the decision to abandon it; and (2) his waiver was voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  See Lego v. Twomey, 404 U.S. 477, 489 (1972) (applying preponderance of the evidence test in voluntariness inquiries); United States v. Grimes, 142 F.3d 1342, 1350 (11th Cir. 1998) (applying preponderance of evidence standard).  There being no basis for suppression of Defendant's statements, the motions should be denied.

## IV.   CONCLUSION

For the reasons set forth above, the Court **REPORTS AND RECOMMENDS** Defendant's Motions for Dismissal of the Indictment for Selective Prosecution be **DENIED**, (doc. no. 92, pp. 11, 14-16; doc. no. 93), Defendant's Motion to Suppress the Statements of Officer Cecil Ridley be **DENIED**, (doc. nos. 121, 127), Defendant's Motion for Dismissal of

the Indictment for Speedy Trial Act violations be **DENIED**, (doc. no. 92, p. 11), and Defendant's Motions for Dismissal of the Indictment/Suppression of the Evidence be **DENIED**, (doc. no. 92, pp. 7-9; doc. nos. 94, 120, 122, 124, 128, 130, 134).

SO REPORTED and RECOMMENDED this 13th day of December, 2021, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA